UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
SCOTT A. McNAMARA, M.D.,          )
                                                )
      Plaintiff/Counter-Defendant,    )
                                                )
v.                      )  Civil Action No. 11-1051 (ESH)
                                                )
CATHERINE A. PICKEN, M.D., *et al.*,  )
                                                )
      Defendants/Counter-Plaintiffs.  )
_____)

## MEMORANDUM OPINION

Before the Court are two post-trial motions: (1) plaintiff/counter-defendant's motion for a new trial as to the fraudulent misrepresentation and promissory fraud claims (Aug. 15, 2013 [ECF No. 163] ("New Trial Mot.")); and (2) plaintiff/counter-defendant's motion for a new trial or, in the alternative, for remittitur. (Aug. 15, 2013 [ECF No. 164] ("Remittitur Mot.").)

## BACKGROUND

Plaintiff Scott A. McNamara, M.D., filed suit against Catherine A. Picken, M.D., and the Washington ENT Group PLLC ("WENT") for an accounting, conversion, breach of partnership agreement, and breach of employment contract. (*See* Amended Complaint, Jan. 29, 2013 [ECF No. 62-1].) Defendants counterclaimed, alleging fraud, breach of fiduciary duty, promissory fraud, and aiding and abetting a breach of fiduciary duty. (*See* Answer, Affirmative Defenses, and Counterclaims to Amended Complaint, Mar. 29, 2013 [ECF No. 74] ("Answer").)[1] Following a five-day jury trial, on July 19, 2013, the jury found against Dr. McNamara on all of his claims and for Dr. Picken/WENT on all of their counterclaims. (*See* Verdict Form [ECF No.

---

[1] Defendants also initially brought a counterclaim for inducement of a breach of fiduciary duty, but they withdrew that counterclaim prior to trial. (*See* Defendants/Counter-Plaintiffs' Notice Regarding Counterclaim V, July 1, 2013 [ECF No. 127].)

145].) The jury awarded $215,656.72 in compensatory damages based on the two counterclaims for fraud, $52,556.97 in compensatory damages based on the counterclaim for aiding and abetting a breach of fiduciary duty, and $250,000 in punitive damages. (*See id.*)[2] With the consent of both parties, the Court inquired of the jury as to what portion of its punitive damages award was based on Dr. Picken's attorney's fees. (July 19, 2013 Transcript [ECF No. 157] ("July 19 Tr.") at 27-28.) The jury foreperson responded that $211,000 of the punitive damages award was based on attorney's fees incurred through July 2013, and the remaining $39,000 was "another figure that [they] thought was just." (*Id.* at 28-29.)

Dr. McNamara has now filed two motions for post-trial relief, one alleging that there was insufficient evidence to support Dr. Picken/WENT's two claims of fraud, and the other alleging that the punitive damages award was excessive. Dr. Picken opposes both motions. (*See* Opposition to Motion for Partial New Trial, Aug. 23, 2013 [ECF No. 166] ("New Trial Opp'n"); Opposition to Motion for New Trial or Remittitur, Aug. 23, 2013 [ECF No. 167] ("Remittitur Opp'n").)

## ANALYSIS

### I. LEGAL FRAMEWORK

Federal Rule of Civil Procedure 59(a) provides that the Court may grant a new trial on all or some of the issues raised in a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). One such reason is "if the verdict appears to . . . be against the weight of the evidence." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (citation omitted). This discretion also includes

---

[2] The jury found Dr. McNamara liable for breach of fiduciary duty, but did not award any additional damages for that claim. (*See* Verdict Form [ECF No. 145].)

"overturning verdicts for excessiveness and ordering a new trial . . . conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Id.*

The disposition of a motion for new trial is "entrusted to the sound discretion of the trial court." *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985) (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)). However, "the court should be mindful of the jury's special function in our legal system and hesitate to disturb its findings." *Wild v. Alster*, 377 F. Supp. 2d 186, 189 (D.D.C. 2005) (internal quotation marks omitted). "Generally, a new trial may only be granted when a manifest error of law or fact is presented." *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 78, 87 (D.D.C. 2006). Indeed, a Rule 59(a) motion should be granted only where "the court is convinced that the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice.'" *Bowie v. Maddox*, 540 F. Supp. 2d 204, 208 (D.D.C. 2008) (quoting *Nyman v. Fed. Deposit Ins. Corp.*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (internal quotation marks omitted). "The jury verdict stands unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict." *Youssef v. F.B.I.*, 687 F.3d 397, 403 (D.C. Cir. 2012) (internal quotation marks and citation omitted). "The burden of showing that a new trial is warranted in accordance with the rigorous standard rests with the moving party." *Czekalski v. Sec'y of Transp.*, 577 F. Supp. 2d 120, 122 (D.D.C. 2008).

## II. DR. McNAMARA'S MOTION FOR NEW TRIAL AS TO THE FRAUDULENT MISREPRESENTATION AND PROMISSORY FRAUD CLAIMS

Dr. McNamara does not challenge the jury's verdict with respect to his aiding and abetting breach of fiduciary duty. However, he does claim that there was insufficient evidence to support the jury's verdict on the fraud claims. (*See* New Trial Mot. at 1-2.)

At trial, Dr. McNamara did not file a motion for judgment as a matter of law at the close of counter-plaintiffs' case, as he was permitted to do under Rule 50(a). *See* Fed. R. Civ. P. 50(a). Instead, he now files a Rule 59 motion in which he raises his concerns about the evidentiary support for the fraud claims for the first time. Dr. Picken argues that Dr. McNamara's failure to raise this issue pre-judgment is fatal to his new trial motion. (*See* New Trial Opp'n at 4-5.) Although it may have been more prudent for him to have raised this issue earlier, "[t]he failure to seek a judgment as a matter of law at the close of all the evidence does not procedurally bar a motion for a new trial." 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2531 (3d ed. West 2013); *see also Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 546 (3d Cir. 2010) ("Unlike Rule 50, the text of Rule 59 does not require any pre-verdict motions."); *Manfred v. Superstation, Inc.*, 365 F. App'x 856, 857 (9th Cir. 2010) ("A litigant who files a Federal Rule of Civil Procedure 59 motion for new trial, however, is not required to file a Rule 50(a) motion first.").[3]

Nevertheless, the Court does not agree with Dr. McNamara that the jury's verdict was "against the weight of the evidence." (New Trial Mot. at 1-2.) Just the opposite is true. With respect to the promissory fraud claim, Dr. McNamara argues that the jury's verdict was not supported by the evidence primarily for two reasons: first, that there is no evidence in the record

---

[3] Dr. Picken also claims that Dr. McNamara's post-trial motions are untimely. (*See* New Trial Opp'n at 6; Remittitur Opp'n at 12-13.) Dr. Picken points out that at the close of trial the Court asked for any motion for a remittitur to be filed by "next Friday," which was July 26, 2013. (July 19 Tr. at 30-31.) There was also some discussion about the proper deadline for any motions for a new trial. (*See id.* at 31.) In light of those discussions, counsel for Dr. McNamara called chambers shortly after trial to confirm when his post-trial motions were due. At that time, he was instructed simply to follow the requirements of the Federal Rules of Civil Procedure. Rule 59 clearly states that a party has 28 days after the entry of judgment in which to file any motions for a new trial. Fed. R. Civ. P. 59(b). Judgment in this case was entered on July 19, 2013. (*See* Clerk's Judgment [ECF No. 148].) Thus, because Dr. McNamara filed both of his post-trial motions on August 15, 2013—27 days after the entry of judgment—his motions were timely filed.

that Dr. McNamara ever represented his "intent to behave," and second, that his post-September 1, 2010 actions are insufficient to call into question his pre-September 1, 2010 intent. (*See id.* at 13-15.) Neither of these arguments satisfies the exacting standard under Rule 59, especially given the deference owed to the jury's verdict and its assessment of the credibility of the parties.

Dr. Picken's promissory fraud counterclaim was premised on her assertion that Dr. McNamara had agreed to join WENT as an employee while he and Dr. Picken continued negotiations about how to merge their practices into a partnership. (*See* Answer ¶¶ 97-101; Jury Instructions, July 19, 2013 [ECF No. 147] No. 43.) Dr. McNamara argues that the record did not clearly establish "Dr. Picken's expectation that Dr. McNamara 'behave' in a particular manner upon joining WENT" because Dr. Picken testified that there were no "'specific rules articulated in writing as to what type of behavior was expected from Dr. McNamara.'" (New Trial Mot. at 13-14 (citing July 16, 2013 Transcript [ECF No. 154] ("July 16 Tr.") at 194).) But no such evidence is necessary; the record plainly supported the jury's finding that Dr. Picken believed—based on her conversations with Dr. McNamara—that Dr. McNamara would be joining WENT *as an employee*, subject to all of the usual fiduciary duties and behavioral expectations associated with an employment position. Thus, the only question is whether there was sufficient evidence upon which to conclude that he in fact lacked any such intent when he came to work there, and the record is replete with such evidence.

Dr. McNamara himself points to several examples, including his "failure to attend meetings" and his "not following-up on emails he received from [Dr. Picken]." (*Id.* at 14-15.) Additionally, the facts underlying Dr. Picken's claims for breach of fiduciary duty and aiding and abetting Neil Garrin's breach of fiduciary duty—which Dr. McNamara does not challenge—further support the idea that Dr. McNamara's behavior was blatantly inconsistent with that of an

employee.  Moreover, the evidence of Dr. McNamara's intent to deceive goes beyond his actual failure to behave as an employee:  there was testimony that Dr. McNamara resisted WENT's staff's efforts to fill out his employee paperwork; Dr. Assad Khoury served as a character witness and testified about Dr. McNamara's reputation for untruthfulness; and Dr. McNamara himself testified that he thought of himself as a partner when he entered the practice.

Dr. McNamara's only real response to this evidence is to claim that it is irrelevant because those actions occurred after September 1, 2010, the date on which he began working at WENT.  (*See id.*)  Although some courts have noted that a promisor's intent "must be shown to be false by evidence other than subsequent failure to keep the promise," *Kroger v. Legalbill.com*, 436 F. Supp. 2d 97, 107 (D.D.C. 2006) (internal quotation marks omitted) (applying Tennessee law), it is also true that a "defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred *after* the alleged misrepresentations were made." *Heisz v. Galt Indus., Inc.*, 93 So. 3d 918, 926 (Ala. 2012) (emphasis added) (internal quotation marks omitted); *see also Cash v. United States*, 700 A.2d 1208, 1212 (D.C. 1997) ("Evidence of a subsequent act, if connected in some material way with the event in question, can be probative of a prior state of mind.").  For example, intent to deceive has been inferred from such circumstances as a defendant's "hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform."  *Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 420 (C.D. Cal. 2012) (quoting *Tenzer v. Superscope, Inc.*, 702 P.2d 212, 219 (Cal. 1985)).  There is no question that the trial evidence, including all circumstantial evidence and inferences to be drawn therefrom, was sufficient to support the jury's finding that Dr. McNamara committed promissory fraud.

The same is true of the fraudulent misrepresentation claim. Dr. Picken's counterclaim was premised on several misrepresentations or omissions allegedly made by Dr. McNamara during their partnership negotiations, including: (1) that he falsely led her to believe that his practice was at least as productive as hers was; (2) that he failed to tell her he was being sued by his landlord; (3) that he did not reveal that he had previously filed for bankruptcy; and (4) that he failed to tell her his income from his work at the Serenity Day Spa was encumbered by an IRS lien. (*See* New Trial Mot. at 4-5.)

With respect to the first alleged misrepresentation, Dr. McNamara claims that there was no evidence showing that Dr. Picken had disclosed the exact "size and productivity" of her practice prior to the merger, and so Dr. McNamara's suggestion that his practice was "at least as productive" as hers was merely an opinion that cannot constitute a misrepresentation. (*Id.* at 6-8.) That is simply untrue. The statement itself implies a familiarity with Dr. Picken's practice, and given the lengthy friendship and professional history between the two doctors, the jury could well have concluded that Dr. McNamara had knowledge about the size of her practice. Moreover, the evidence adduced at trial supports a conclusion that this representation was false. For example, Defense Exhibit 129 shows that in December 2010, Dr. Picken brought in $25,979.18 in net revenue, while Dr. McNamara's efforts resulted in a net loss of $7,679.01. Similarly, Dr. Picken testified that in terms of collections of patient payments, hers were roughly $60,000-80,000 per month, while Dr. McNamara averaged around $40,000. (July 16 Tr. at 162-63.) Given the jury's verdict for Dr. Picken on all claims and counterclaims, it is clear that the jury found her to be more credible than Dr. McNamara, and the Court has no reason to disturb that conclusion. Thus, the evidence was sufficient to support the jury's verdict that Dr.

McNamara's misrepresentation of the robustness of his medical practice constituted fraudulent misrepresentation.

With respect to Dr. McNamara's omissions of his lawsuit with his landlord and his previous bankruptcy, Dr. McNamara argues that there is no evidence that those matters were "material" to Dr. Picken's decision to enter into business with him. (*See* New Trial Mot. at 8-10.) As an initial matter, whether a reasonable person would have found those things to be "material" is a question for the jury. But regardless, as Dr. McNamara admits, a fact is material if "the maker of the representation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it." (*Id.* at 8 (quoting Restatement (First) of Torts § 538).) Dr. Picken clearly stated that she would not have gone into business with Dr. McNamara if she had known about his previous financial difficulties, specifically including his bankruptcy. (*See* July 17, 2013 Transcript [ECF No. 155] ("July 17 Tr.") at 156-58.) Moreover, in discussing the proposition of a merger with Dr. McNamara, Dr. Picken testified that she disclosed all of her outstanding loans, obligations, and lawsuits. (*See* July 16 Tr. at 148-50.) The jury could well have found, therefore, that Dr. McNamara knew that Dr. Picken considered such preexisting financial limitations to be highly relevant, even if a reasonable person would not have done so. Thus, the evidence of Dr. McNamara's omission of his several prior financial troubles was sufficient to support the jury's verdict as to fraudulent misrepresentation.

Finally, the fraudulent misrepresentation verdict was further supported by the evidence that Dr. McNamara failed to tell Dr. Picken that his income from the Serenity Day Spa was encumbered by an IRS lien. Dr. McNamara argues that this omission is irrelevant because Dr. Picken admitted they had not formally agreed that the revenue from the spa would be considered

joint partnership money. (*See* New Trial Mot. at 4 (citing July 16 Tr. at 201).) However, that fact does not render Dr. McNamara's omission any less fraudulent, as the evidence was sufficient to show that he knew she was considering that revenue as a relevant asset when evaluating his financial situation and deciding whether to enter into a partnership with him. (*See, e.g.*, July 16 Tr. at 153-55 (stating that Dr. Picken sent Dr. McNamara an email saying that she expected him to contribute his income from the spa to the partnership).)

Thus, far from concluding that the jury's verdict was a "seriously erroneous result" that would result in a "clear miscarriage of justice," *Bowie*, 540 F. Supp. 2d at 208, the Court is convinced that the jury's verdict is supported by the weight of the evidence adduced at trial. The Court therefore declines to upset the jury's verdict with respect to the fraud counterclaims.

## III. DR. McNAMARA'S MOTION FOR NEW TRIAL OR REMITTITUR

Dr. McNamara has also moved for a new trial on punitive damages, or, in the alternative, for remittitur. (*See* Remittitur Mot.) "Federal trial courts may review jury awards of damages for excessiveness and may order remittitur or a new trial where damages are found excessive." *See Harvey v. Mohammed*, No. 02-2476, 2013 WL 1749899, at *13 (D.D.C. Apr. 24, 2013) (citing *Gasperini*, 518 U.S. at 433). In this Circuit, remittitur is only permitted when "(1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Peyton v. DiMario*, 287 F.3d 1121, 1123-24 (D.C. Cir. 2002) (citing *Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 96 (D.C. Cir. 1987)). In granting remittitur, a district court's reduction must still "permit[] recovery of the highest amount the jury tolerably could have awarded." *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (quoting *Carter v. District of Columbia*, 795 F.2d 116, 135 n.13 (D.C. Cir. 1986)).

Dr. McNamara argues that $211,000 of the jury's punitive damages award for attorney's fees is excessive for two reasons: (1) that the documentary evidence submitted to the jury does not support a finding that Dr. Picken incurred $211,000 in attorney's fees (*see* Remittitur Mot. at 4-9); and (2) that the evidence regarding Dr. Picken's legal fees did not distinguish between fees incurred to prosecute the counterclaims for which she was awarded punitive damages and fees incurred to defend against the claims brought by Dr. McNamara. (*See id.* at 9-13.)

A.  **Evidentiary Support for Jury's Verdict**

At trial, the Court bifurcated the liability and punitive damages phases. After the jury returned its initial verdict and announced its determination that Dr. Picken was entitled to punitive damages, the Court permitted Dr. Picken to introduce additional evidence relating to punitive damages. Dr. Picken took the stand to testify about the amount of money she had paid in attorney's fees since the start of this litigation. In pertinent part, she testified that she had paid—or was required to pay—approximately $35,000 in 2011, $10,000 per month during 2012, and $8,000 per month during 2013. (*See* July 19 Tr. at 16.) Including May 2013, that amounted to $195,000. In support of her testimony, Dr. Picken introduced Defense Exhibit D-215, which she said was "invoices and copies of checks for the same. Checks for the invoices starting in April of 2011 through—this is invoice dated today." (*Id.* at 17.) Dr. McNamara did not object to the introduction of D-215, nor did he object to any portion of Dr. Picken's testimony. (*See id.* at 15-18.) He also did not choose to cross-examine Dr. Picken in the punitive damages phase of the case. (*See id.* at 18.) Furthermore, in his closing argument, he did not challenge Dr. Picken's estimates of how much money she had paid in attorney's fees, and even told the jury that he was *not* suggesting that they go through every bill included in D-215. (*See id.* at 22.) But, he did argue to the jury that Dr. Picken should only be awarded attorney's fees for the amount spent on prosecuting the counterclaims, not "all the time that was taken." (*See id.*)

10

The jury awarded Dr. Picken $250,000 in punitive damages, of which $211,000 represented attorney's fees. (*See id.* at 28-29.) That number is consistent with Dr. Picken's testimony if her liability for legal fees were extended through July 2013 (the month of the trial): $35,000 for 2011, $10,000 per month for all 12 months of 2012, and $8,000 per month for the 7 months of 2013.

Despite Dr. McNamara's apparent acceptance of the evidence relating to Dr. Picken's legal fees at trial, he now seeks remittitur on the grounds that D-215 does not support a finding that Dr. Picken incurred $211,000 of attorney's fees through July 2013. Specifically, he argues that the evidence shows that the "fixed fee" agreement Dr. Picken mentioned was actually an agreement that she would owe "not more than" $10,000 per month in 2012 and $8,000 per month in 2013, such that if less liability were incurred in a given month, she would not be responsible for paying that full amount. (*See* Remittitur Mot. at 6-8 & n.3.) He then points to several months in 2012 where Dr. Picken appears to have been invoiced—and paid—amounts less than $10,000. (*See id.* at 7-8 n.3.) By Dr. McNamara's calculations, D-215 shows that Dr. Picken was invoiced at most $174,945.95 through July 2013, not $211,000. (*See id.* at 8.)

Dr. McNamara raises legitimate concerns about the accuracy of Dr. Picken's estimates in light of the documentary evidence she provided to support them. However, the proper venue for airing those concerns was through cross-examination of Dr. Picken. Dr. McNamara was given the opportunity to object to D-215 and to cross-examine Dr. Picken about her testimony, but chose not to do so.[4] Remarkably, he even *discouraged* the jury from poring over every page of

---

[4] Dr. McNamara claims that when D-215 was admitted into evidence, that "was the first time that the Counter-Defendant was provided any proof of attorney's fees," because D-215 "was not exchanged during the pretrial process." (Remittitur Mot. at 6-7.) If Dr. McNamara was not familiar with the contents of the exhibit, he should not have stated that he had no objection to it (*see* July 19 Tr. at 18); rather, he should have requested time from this Court to review it before

11

D-215. (*See* July 19 Tr. at 22.) It is well established that Rule 59 "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Mohammadi v. Islamic Republic of Iran*, No. 09-1289, 2013 U.S. Dist. LEXIS 97509, at *8 (D.D.C. July 12, 2013) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008)); *see also Wild*, 377 F. Supp. 2d at 189 ("[A motion for new trial] cannot be used to raise arguments which could, and should, have been made before the judgment [was] issued."). Nor is Rule 59 "a chance for [a party] to correct poor strategic choices." *S.E.C. v. Bilzerian*, 729 F. Supp. 2d 9, 15 (D.D.C. 2010). Thus, Dr. McNamara's failure to pursue this line of reasoning at trial precludes him from seeking a new trial on these grounds.

But regardless, in light of the high standard required to upset a jury's verdict, the Court cannot say that the jury's award of $211,000 in punitive damages for attorney's fees was "against the weight of the evidence." *Gasperini*, 518 U.S. at 433. To begin with, the jury could have relied on Dr. Picken's testimony to determine the amount of legal fees she incurred. Moreover, D-215 appears to be incomplete; for example, some invoices show receipt of payments that are not documented by copies of any checks. (*See, e.g.*, Remittitur Mot. Ex. A, Def.'s Ex. D-215 ("D-215"), Invoice #5023 (showing no outstanding balance on Invoice #5015, despite the fact that D-215 does not contain checks totaling the full amount due in Invoice #5015).) Additionally, there are references in the exhibit to invoices that do not appear therein. (*See, e.g.*, *id.*, Check #2405 (stating that it was for payment of Invoices #4 and #5, despite the fact that D-215 does not contain an Invoice #5).) The jury therefore could well have concluded that D-215 did not represent every invoice, bill, or payment made or received by Dr. Picken in relation to this litigation, but instead, chose to rely on her testimony to determine punitive damages. The

---

allowing it to be submitted to the jury, or, at least, prior to deciding whether to cross-examine Dr. Picken.

Court will therefore not take the extraordinary step of setting aside the jury's punitive damages award on this basis.

### B. Segregation of Fees Incurred to Defend Dr. McNamara's Claims

Dr. McNamara's second argument is that Dr. Picken should only be permitted to recover attorney's fees relating to the prosecution of her counterclaims, rather than work performed solely to defend against Dr. McNamara's claims. (*See* Remittitur Mot. at 9-13.)

Before Dr. Picken presented her evidence relating to punitive damages, the Court expressed concern about this very point. Specifically, the Court questioned whether it was appropriate for Dr. Picken to put on evidence about the full extent of her attorney's fees incurred to that point, considering that at least some of those fees had necesarily been incurred to defend Dr. McNamara's claims. (*See* July 19 Tr. at 10-14.) As those fees were therefore unrelated to the counterclaims on which she had prevailed, the Court suggested that they should not factor into a computation of punitive damages on the counterclaims. (*See id.*)

Dr. Picken responded that it was appropriate to allow the jury to hear evidence on all of the attorney's fees both because the majority of her attorneys' time and effort was spent prosecuting her counterclaims, and because her proffer of attorney's fees was just a marker or a place for the jury to start in assessing what she had incurred "to fight this fight." (*Id.* at 11-12.) The Court ultimately agreed that Dr. Picken could present all of her evidence, but warned that "[i]f the jury doesn't cut it down considerably, I will." (*Id.* at 13.)

In his closing argument, Dr. McNamara did attempt to highlight this issue for the jury by pointing out that "the attorney's fees to be awarded can only be awarded with respect to the amount spent prosecuting the counterclaim." (*Id.* at 22.) Nevertheless, the jury awarded Dr. Picken the full amount of attorney's fees she testified to having paid to that point, as well as an additional $16,000 to cover her expenses for June and July 2013. (*See* July 19 Tr. at 28-29.)

13

Dr. McNamara now asks the Court to cut the award of attorney's fees by half. (*See* Remittitur Mot. at 12-13.) The Court agrees since any award of attorney's fees as an element of punitive damages must be limited to those fees incurred in the prosecution of Dr. Picken's counterclaims.

Under the "American Rule," "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013) (citation omitted). Here, no statute entitles Dr. Picken to attorney's fees for defending against Dr. McNamara's claims, nor is there any authority permitting attorney's fees as part of compensatory damages for any of Dr. Picken's counterclaims. The only basis for attorney's fees in this case is the District of Columbia rule that permits a jury to factor in attorney's fees when calculating punitive damages. (*See* D.C. Standard Civil Jury Instruction 16.03 ("To determine the amount of the award you may consider . . . any attorney's fees that the plaintiff has incurred in this case." (citing *Town Ctr. Mgmt. Corp. v. Chavez*, 373 A.2d 238, 245-46 (D.C. 1977))).)[5]

This Court is not aware of any case that discusses whether a jury considering punitive damages should be permitted to consider attorney's fees that a prevailing counter-plaintiff may

---

[5] Dr. Picken also seems to argue that she is entitled to recover all of her attorney's fees because Dr. McNamara acted "maliciously" or in "bad faith" in bringing his claims against her. (*See* Remittitur Opp'n at 22-24.) It is true that under certain exceptions to the American Rule, a Court may award attorney's fees incurred for defending against a claim as an element of damages in malicious prosecution cases, *Weisman v. Middleton*, 390 A.2d 996, 999 (D.C. 1978), or "when the other party 'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Launay v. Launay, Inc.*, 497 A.2d 443, 450 (D.C. 1985) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975) (internal quotation marks omitted)). However, Dr. Picken did not file a counterclaim for malicious prosecution, nor has she ever argued that she was entitled to attorney's fees as part of her compensatory damages based on Dr. McNamara's bad faith. To the contrary, at the pretrial conference, Dr. Picken agreed that attorney's fees were not part of her compensatory damages (*see also* Defendants/Counter-Plaintiffs' List of Itemized Damages, July 1, 2013 [ECF No. 126-1] at 7, 9 (listing attorney's fees only as part of punitive damages)), so she may not argue to the contrary now.

have incurred in defending against a plaintiff's claims, or if the attorney's fees are limited to those fees relating to counterclaims for which the punitive damages are being awarded. However, the Court concludes that the latter approach is more appropriate, as it is consistent with the general principles underlying the American Rule. Indeed, absent Dr. Picken's counterclaims, she would not have been eligible to receive any attorney's fees for time spent defending against Dr. McNamara's claims. The Restatement appears to endorse this approach. It acknowledges the general rule that "damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of litigation." Restatement (Second) of Torts § 914. However, in a comment to that subsection, it recognizes the exception that "[i]n awarding punitive damages when they are otherwise allowable, the trier of fact may consider the actual or probable expense incurred by the plaintiff *in bringing the action*." *Id.* cmt. a (emphasis added). In other words, only legal fees related to the claims *brought by* a prevailing counter-plaintiff should be recoverable.

Dr. Picken argues, nonetheless, that she should be permitted to recover the full amount of her attorney's fees because "the claim[s] defended and the counterclaim[s] prosecuted substantially overlap *factually*." (Remittitur Opp'n at 24.) To be sure, there is overlap between these claims, such that some of the work Dr. Picken's counsel did no doubt furthered both her defenses to Dr. McNamara's claims and her prosecution of her counterclaims. For example, she raised an affirmative defense of fraud to several of Dr. McNamara's claims, and then separately brought counterclaims alleging fraud based on the same facts. (*See id.* at 25.) However, it also easy to see that there is not a complete overlap. For example, a review of Dr. Picken's counsel's invoices, as compiled in Defense Exhibit D-215, reveal several tasks that are wholly unrelated to her counterclaims, including: (a) arranging acceptance of service of Dr. McNamara's complaint

15

and discussing its contents with Dr. Picken (*see* D-215, June 17, 2011 Invoice); (b) preparing two rounds of motions for judgment on the pleadings with respect to Dr. McNamara's claims (*see, e.g.*, *id.*, Aug. 11, 2011 Invoice, Apr. 30, 2013 Invoice, June 6, 2013 Invoice); (c) opposing Dr. McNamara's motion for leave to amend his complaint (*see, e.g.*, *id.*, Mar. 13, 2013 Invoice); and (d) retaining an expert to rebut Dr. McNamara's expert in support of his claims and filing a motion to exclude Dr. McNamara's expert (*see, e.g.*, *id.*, Oct. 31, 2012 Invoice, Apr. 30, 2013 Invoice, June 6, 2013 Invoice). Moreover, some of the invoiced hours relate to work performed well before the filing of any complaint or counterclaims. (*See id.*, Apr. 12, 2011 Invoice.) Finally, many of the invoice entries relate to discovery matters or trial preparation that cannot easily be apportioned between the claims and the counterclaims but that no doubt required more work because of the existence of Dr. McNamara's claims. Thus, it is clear that $211,000 is higher than the "highest amount the jury tolerably could have awarded," *Langevine*, 106 F.3d at 1024, and thus, Dr. Picken should not be permitted to receive 100% of her legal fees as part of her punitive damages award.

Based largely on the difficulty in determining from the invoices exactly which tasks related to defending Dr. McNamara's claims and which tasks related to prosecuting Dr. Picken's counterclaims, Dr. McNamara suggests a 50% reduction in the attorney's fees award. (Remittitur Mot. at 12-13.) At least in a case where attorney's fee are available, the party seeking fees has the burden of documenting the appropriate number of hours expended. *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995). However, Dr. Picken has offered the Court no more precise way of determining what an appropriate percentage reduction would be. The Court will therefore accept Dr. McNamara's 50% suggestion, and the $211,000 awarded for attorney's fees will be reduced by half, to $105,500.

16

Dr. McNamara also argues that the remaining $39,000 awarded by the jury that was not attributable to attorney's fees should be reduced by the same proportion as the attorney's fees. (*See* Remittitur Mot. at 13.) The Court disagrees. The jury foreperson was clear that the $39,000 was an amount that the jury "thought was just." (July 19 Tr. at 28.) The Court has no basis whatsoever to upset the jury's conclusion that $39,000 was an appropriate amount to award above and beyond legal fees, and declines to do so.[6]

Thus, the Court will order a remittitur of the jury's punitive damages award of $105,500 (from $250,000 to $144,500). Dr. Picken will have twenty-one days in which to decide whether to accept a reduced award of $144,500 or whether to proceed to a new trial on punitive damages.

## CONCLUSION

For the foregoing reasons, plaintiff/counter-defendant's Motion for New Trial as to the Fraudulent Misrepresentation and Promissory Fraud claims is denied, and plaintiff/counter-defendant's Motion for New Trial or Remittitur is granted in part. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: August 30, 2013

---

[6] Dr. McNamara also argues that the punitive damages award should be reduced by $9,344.44, the amount that Magistrate Judge Facciola previously ordered Dr. McNamara to pay in attorney's fees as a sanction. (*See* Order, June 4, 2013 [ECF No. 100].) However, this request is now moot because Dr. Picken has informed the Court that "Judgment Creditors have agreed to apply [payment of the sanctions order] as a dollar-for-dollar credit against the punitive damages awarded by the jury." (Motion for Examination of Judgment Debtor Scott A. McNamara, M.D., Aug. 8, 2013 [ECF No. 158] at 2 n.1.)